UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ERIC D. BATTLE**, | |
| Plaintiff, | |
| v. | Case No. 1:18-cv-02345 (TNM) |
| **STEVEN T. MNUCHIN**, *Secretary, U.S. Department of the Treasury*, | |
| Defendant. | |

### MEMORANDUM OPINION

Eric Battle applied for an assistant supervisor position in the Bureau of Engraving and Printing, part of the U.S. Department of the Treasury. There were three openings, but Battle finished fourth in the selection process, so he did not get the job. Battle claims his nonselection was discriminatory based on race and color in violation of Title VII of the Civil Rights Act. But he offers no meaningful evidence of discrimination and all the available evidence shows this was, at most, a close call between similarly qualified candidates. *See Barnette v. Chertoff*, 453 F.3d 513, 516–18 (D.C. Cir. 2006). The Court will thus grant the Treasury Secretary's motion for summary judgment.

**I.**

The parties largely agree on the facts.[1] In November 2017, the Bureau announced three openings for "Pressperson (Offset) Assistant Supervisor." Def.'s Statement of Material Facts

---

[1] In response to the Secretary's twenty-paragraph statement of undisputed facts, Battle agrees with paragraphs 1-15 and 18, and he disputes only certain portions of paragraphs 16, 17, 19, and 20. *See* Pl.'s Claim of Disputed Material Facts ("PCDMF") ¶¶ 1–4, ECF No. 19; Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute ¶¶ 1–2, ECF No. 19. In analyzing the Secretary's motion for summary judgment, the Court relies only on facts that Battle concedes.

Not in Dispute ("DSMF") ¶¶ 1, 3, ECF No. 18. Battle, who is African American and had been a Bureau employee for seven years, applied for the position. Pl.'s Statement of Add. Material Facts Not in Dispute ("PSAMF") ¶¶ 1–2, 4, ECF No. 19; Def.'s Resp. to PSAMF ¶¶ 2, 4, ECF No. 20-1.

The hiring process involved two phases: (1) interviews by a panel and (2) an ultimate decision by David Hatch, the selecting official. Hatch appointed the interview panel, which consisted of panel chair Scott Green, Thomas Fleming, and John Bernhard. DSMF ¶ 4; Green Decl. ¶ 2, ECF No. 18-2. The panel's role was to recommend candidates. DSMF ¶ 5. Both Hatch and Green expected "that the interview panel would recommend the three candidates that received the top three scores." *Id.* ¶ 6. And Hatch "had the authority to make his selection decision by solely utilizing the rankings of the candidates by the interview panel." *Id.* ¶ 14.

The panel interviewed eight candidates, including Battle. *Id.* ¶¶ 7, 10. All were asked the same ten questions, eight of which were scored by each panelist on a scale of zero to four. *Id.* ¶ 7. Thus, each interviewee could receive a maximum score of 32 from an individual panelist and a maximum cumulative score of 96. Green Decl. ¶ 4. Based on the cumulative scores, the top three candidates were Jason Molino (score of 69), Mark Agambar (68), and Chris Tabor (63). DSMF ¶ 10. Battle came fourth (58). *Id.*

The panel recommended Molino and Agambar as the top two candidates. *Id.* ¶ 11. For the third opening, "the normal procedure" would have been for the panel to recommend only Tabor—who had the third-best score—and *not* to recommend Battle for further consideration. *Id.* ¶¶ 6, 12. But instead, the panel discussed the lack of diversity among the top three candidates, all of whom were white. Green Decl. ¶ 6. It ultimately referred both Tabor and

2

Battle for further consideration, given that Battle's score of 58 was "relatively close" to Tabor's score of 63 and "to ensure diversity in the panel's recommendation" to Hatch.  DSMF ¶ 13.

Even so, all agree that Hatch still could have made his decision based solely on how the panel ranked the candidates, which would have meant Tabor getting the final spot.  *Id.* ¶ 14.  Yet Hatch also looked beyond the numbers.  He asked Kristopher Dethloff, a subject matter expert familiar with the requirements of the position, to recommend either Tabor or Battle for the third opening.  *Id.* ¶ 15; Hatch Decl. ¶ 5, ECF No. 18-3.

In forming his recommendation, Dethloff compared the two candidates' resumes and interview scores, and he solicited the opinion of their common manager, Robert Bernhard.  DSMF ¶ 17; PSAMF ¶ 8.[2]  Dethloff ultimately recommended Tabor.  *See* Hatch Decl. Ex. 2, ECF No. 18-3.  He explained his reasoning in an email to Hatch.  In Dethloff's view, Tabor's resume included more specific and relevant details than Battle's did, and he considered Tabor's superior interview score an "important independent factor."  *Id.*  More, R. Bernhard had told Dethloff "[w]ithout hesitation" that "Tabor would be a better fit for [the] position."  *Id.*  According to R. Bernhard, Tabor had shown "good leadership characteristics," while Battle "ha[d] not exhibited the leadership characteristics that would be expected."  *Id.*

After receiving Dethloff's recommendation, Hatch himself spoke to R. Bernhard, who—all agree—gave Hatch "information consistent with what [Dethloff] had reported."  DSMF ¶ 18.  For example, R. Bernhard told Hatch that Battle "had difficulty accepting responsibility for his

---

[2]  To distinguish between Robert Bernhard and John Bernhard (one of the members of the interview panel), the Court will refer to "R. Bernhard" or "J. Bernhard," respectively.

3

mistakes," while Tabor "worked well with others."  Hatch Decl. ¶ 14.  Hatch also spoke to managers for the top two candidates, Molino and Agambar.  *Id.*[3]

In the end, Hatch chose Tabor over Battle.  Based on his conversations with the four candidates' managers and Dethloff's recommendation, which were consistent with the interview scores, Hatch selected Molino, Agambar, and Tabor for the three openings.  *Id.* ¶ 16; DSMF ¶ 20.  Of those involved in the hiring process, four were white (Fleming, J. Bernhard, Hatch, and Dethloff) and one was black (Green).  PSAMF ¶¶ 6, 8.  R. Bernhard is also white.  *Id.* ¶ 8.

Battle soon filed a complaint with the Equal Employment Opportunity Commission.  *Id.* ¶ 16.  After receiving a "final decision" from the Commission,[4] he sued here, claiming that his nonselection was discriminatory based on race and color in violation of Title VII.  Compl. ¶¶ 9, 36–63, ECF No. 1.[5]

Now, after nine months of discovery, the Secretary moves for summary judgment.  Def.'s Mot. at 1, ECF No. 18.[6]  The motion is ripe for disposition.  The Court has jurisdiction under Title VII's jurisdictional provision, 42 U.S.C. § 2000e–5(f)(3), and the federal question statute, 28 U.S.C. § 1331.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 503 (2006).

---

[3]  Citing materials not in the record, Battle asserts that Hatch "never spoke with any of the [candidates'] first-level supervisors."  PCDMF ¶¶ 3–4.  But he does not dispute that Hatch spoke with other supervisors who managed Molino and Agambar.  *See id.*

[4]  Battle does not refer to this "final decision" as a Notice of Right-to-Sue, but he does say he had "90 calendar days from receipt of that decision to file a federal court complaint."  Compl. ¶ 9; PSAMF ¶ 16.

[5]  Count I alleges discrimination based on "race," and Count II alleges discrimination based on "color."  In making his legal arguments, Battle uses the words "race" and "color" in tandem, *see generally* Pl.'s Opp'n, ECF No. 19, so for simplicity, the Court will refer only to "race."

[6]  All page citations refer to the page numbers that the CM/ECF system generates.

**II.**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once it has met this burden, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up). Courts views the evidence in the light most favorable to the nonmoving party. *Brubaker v. Metro. Life. Ins. Co.*, 482 F.3d 586, 588 (D.C. Cir. 2007).

Discrimination cases involve a familiar burden-shifting framework. Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff has the initial burden of making out a prima facie case of discrimination. *Id.* at 802. The employer then must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer does so, the burden shifts back to the plaintiff to establish that the proffered reason was pretext for discrimination. *Id.* at 804.

But once the employer articulates a legitimate, nondiscriminatory reason, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the case becomes all about pretext. The Court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory

reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.*

### III.

### A.

Most of Battle's opposition brief falls under the following heading: "Defendant fails to Provide a Legitimate, Nondiscriminatory Reason to Rebut Plaintiff's *Prime Facie* Case." Pl.'s Opp'n at 12–25, ECF No. 19. This emphasis is misplaced. The employer's burden to articulate a legitimate, nondiscriminatory reason for its decision is a "minimal burden of production." *Barnette*, 453 F.3d at 516. To carry this burden, an employer need only offer admissible evidence that "raises a genuine issue of fact as to whether it discriminated against the plaintiff" and "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). The employer's explanation must be "credible," "clear," and "reasonably specific." *Figueroa v. Pompeo*, 923 F.3d 1078, 1088 (D.C. Cir. 2019). It should provide "sufficient clarity so that the plaintiff [has] a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56.

The Secretary has met this burden. He explains that Battle was not hired because he was the fourth-ranked candidate for a position with three openings. Def.'s Mot. at 12, 14, 16. Hatch, the selecting official, made this determination based on the scoring of the interview panel, his conversations with the candidates' managers, and Dethloff's recommendation. *Id.* at 12. Plenty of admissible evidence supports this explanation. *See, e.g.*, Green Decl. ¶ 6; Hatch Decl. ¶¶ 5, 9–14, 16; Hatch Decl. Ex. 2; Pl.'s Opp'n Ex. 2 at 3–5, ECF No. 19-2.

Indeed, despite the main heading in his brief, Battle never articulates how, in his view, the Secretary fails his burden of production. He never claims that the Secretary's explanation is

insufficiently specific or unsupported by admissible evidence. Instead, he insists that the "non-discriminatory reasons for not selecting [him] are merely pretext for discrimination." Pl.'s Opp'n at 12. So Battle ultimately agrees that pretext is the "one central question" here, *Brady*, 520 F.3d at 494, and the Court will construe his arguments as addressing that issue.

**B.**

There are several ways a plaintiff can prove pretext. He can show that similarly situated employees of a different race were treated more favorably, or that the employer was lying about its reasons, *id*. at 495, or even that he was "significantly better qualified for the job," *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc). But it is not enough for Battle to disagree with the merits of the Bureau's decision. The question is not whether he *was* the fourth-best candidate, but whether the Bureau "honestly and reasonably believed" this. *Brady*, 520 F.3d at 496 (emphasis omitted).

"[T]here may be no legitimate jury question . . . [when] a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant independent evidence in the record that no discrimination has occurred." *Aka*, 156 F.3d at 1291. After all, the Court is not a "super-personnel department" able to reassess the relative merits of two similarly qualified candidates. *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999). It may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (cleaned up). Battle must show that, far from being just a close call, the Bureau's decision rose to the level of intentional discrimination. *Id.* at 992.

Here, undisputed facts make this an uphill climb. All agree that Battle received the fourth-highest interview score and the normal procedure would have been for the panel to refer

only the three highest-scoring candidates to Hatch. DSMF ¶¶ 6, 10, 12. So had he been white, his candidacy would have ended there. Yet to ensure diversity in its referral, the panel revivified his candidacy, passing along Battle's name, too. *Id.* ¶ 13. And all agree that Hatch still could have just selected the three highest-scoring candidates without further inquiry. *Id.* ¶ 14. That would have been the normal thing to do. But Hatch also went above and beyond, soliciting other views. *Id.* ¶ 15. So Battle twice received more favorable treatment than was required, apparently *because* he was a minority, which strongly undermines an inference of discrimination. *See, e.g.*, *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).

And Battle fell short at both stages of the selection process. His cumulative interview score, 58, was five points lower than Tabor's. DSMF ¶ 10. All three panelists assigned Tabor a score of 21 (out of 32); Battle received scores of 18, 19, and 21 from Fleming, J. Bernhard, and Green, respectively. Green Decl. Ex. 1 at 5, ECF No. 18-2; Green Decl. Ex. 2 at 40, ECF No. 18-2. At the second stage, Hatch ultimately selected Tabor after both Dethloff and R. Bernhard recommended him over Battle. Hatch Decl. ¶¶ 13–14, 16. R. Bernhard "hands down" thought Tabor was the better candidate. *Id.* ¶ 13.

Thus, none of these six individuals found Battle more qualified than Tabor. Five—Fleming, J. Bernhard, Hatch, Dethloff, and R. Bernhard—rated Battle as less qualified, and one—Green—saw Battle and Tabor as equally qualified. *See* Green Decl. ¶ 6; Green Decl. Exs. 1, 2; Hatch Decl. ¶ 16; Hatch Decl. Ex. 2. This consistency among those involved in the selection process also strongly cuts against an inference of discrimination. *See Hairston v. Vance-Cooks*, 773 F.3d 266, 273–74 (D.C. Cir. 2014).

Battle's attempt to show pretext is also hobbled by his failure to offer materials supporting his factual assertions, contrary to his basic obligations at summary judgment. *See*

8

Fed. R. Civ. P. 56(c)(1)(A).  His opposition brief often cites a "Report of Investigation," but he has not placed this Report in the record.  The only exhibits that Battle appends to his brief are an email chain about the schedule of interviews and the Secretary's responses to some interrogatories.  *See* Pl.'s Opp'n Ex. 1, ECF No. 19-1; *id.* Ex. 2.

But even accepting Battle's factual assertions as true, he fails to raise an inference that his nonselection was the product of discrimination.  The Court will consider each stage of the selection process in turn, as Battle levels overlapping but distinct allegations against the interview panel and Hatch.

**1.**

Battle acknowledges that the interview panel referred him to Hatch so that the final candidate pool would be more diverse.  *See* DSMF ¶ 13; Pl.'s Resp. to DSMF ¶ 1, ECF No. 19.  But he claims this favorable treatment was merely for appearances, as he "was never under serious consideration for any of the three positions."  *See* Pl.'s Opp'n at 12, 16–18.  This theory, if accurate, certainly has troubling implications.  It suggests an elaborate ruse:  those involved in the selection agreed not to hire Battle because of his race, and they purposefully ranked him fourth, giving them cover to include him in the final pool, which they did solely to convey the false impression that the Bureau values diversity.  But he offers no evidence for this theory.

Battle first suggests that the interview process was defective because the scoring unacceptably depended on the subjective perspectives of the panelists, "which could have easily led to bias[ed] scores."  *Id.* at 14–15.  Because "none of the applicants were very well versed in being interviewed," the rankings came down to fine margins—the scoring of one or two questions could have made the difference.  *Id.* at 15.

9

As Battle himself acknowledges, though, the panel sought to account for subjectivity. It reviewed the candidates' responses (as recorded by each panelist) "to determine if there were any major discrepancies" and to "make a final decision on an accurate score." *Id.* at 14–15.[7] And in any event, Battle's focus on subjectivity proves too little. A subjective process is not automatically a discriminatory one. "Even if a plaintiff was victimized by poor selection procedures," the Court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Hairston*, 773 F.3d at 272 (cleaned up).

His only effort to show that the panel had discriminatory motive is to argue that the scoring was "inconsistent and did not accurately reflect the [candidates'] qualifications." Pl.'s Opp'n at 14. He zeroes in on interview questions five and eight, which dealt with "problem solving" and "leadership," respectively. He acknowledges that Tabor received better scores from all three panelists for both questions. *Id.* But he alleges that his responses to these questions were as good as—if not better than—the responses that Molino and Agambar gave. *Id.* at 15–16.

This argument is unpersuasive. For one, all agree that Molino and Agambar were the top two candidates, DSMF ¶¶ 10–11, and Battle nowhere argues that the panelists or Hatch should have selected him over *them*. The relevant comparator is instead Tabor, who was the only one in direct competition with Battle for the third spot. *Id.* ¶ 15; *see* Def.'s Reply at 9, ECF No. 20. Battle does not try to argue that his responses to questions five or eight were longer, more substantive, or in any way better than Tabor's. *See* Pl.'s Opp'n at 15–16.

More, Battle's "self-assessment" that he was the best candidate is not compelling. *See Hairston*, 773 F.3d at 273. He did not see the other seven interviews. He does not explain how,

---

[7] Battle contends that other Bureau officials—such as R. Bernhard—may have misinterpreted the interviewers' notes, Pl.'s Opp'n at 15, but there is no evidence that anyone other than the interviewers consulted these notes, Def.'s Reply at 9, ECF No. 20.

if at all, the panelists' notes mischaracterized his responses. *See* Pl.'s Opp'n at 15–16. Those responses, as recorded by the panelists, *see id*., are not self-evidently better than those of Tabor, Molino, or Agambar. *See, e.g.*, *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) ("The qualifications gap must be great enough to be inherently indicative of discrimination." (cleaned up)). And as noted, there was consistency among the panelists' assessments. Only one panelist, Green, rated Battle and Tabor as equally suitable, and even he did not score Battle higher than Tabor. Against this backdrop, Battle presents no evidence suggesting that the panelists did not honestly and reasonably believe the rankings they assigned. *See Brady*, 520 F.3d at 496.

To be sure, a low ranking in a panel interview does not necessarily doom a plaintiff's discrimination case. Consider *Stoe v. Barr*, 960 F.3d 627 (D.C. Cir. 2020), which also involved a hiring process with an interview component. The court sent the case to trial, *id*. at 629, but this matter is readily distinguishable. The female plaintiff alleged sex discrimination, and abundant evidence showed that the selecting official was biased against women. *Id.* at 637, 643. That same official controlled the interview process, and he was the source of several procedural irregularities. *Id.* at 633–37, 642–45. For example, he assigned an initial scoring range for each interview response and then later settled on a final score. *Id.* at 644. For several questions, he awarded a final score at the low end of the plaintiff's range but at the high end for the successful male candidate. *Id.* at 635, 644. Glaringly, he did so even though he did *not* take notes on the male candidate's responses and his notes on the plaintiff's responses revealed nothing negative. *Id.* The court also discussed other ways that the selecting official manipulated the scoring and the other interview panelists. *Id.* at 644–45. Battle submits no comparable evidence.

One final point on the interview panel: Green, the chair, was African American. Green Decl. ¶ 1. While it is certainly possible for a person to engage in racial discrimination against someone of the same race, common sense suggests that this is unlikely. The presence of a same-race hiring official is thus a factor that weighs against an inference of discrimination. *See Aka*, 156 F.3d at 1291 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 513–14 (1993)). And Green also rated Battle below Molino and Agambar and only on par with Tabor. Green Decl. ¶ 6. So even if Green had been the sole decisionmaker here, it is by no means clear that he would have chosen Battle for one of the three available slots.

Battle responds that Green's race is irrelevant because Hatch (who is white) was the selecting official. Pl.'s Opp'n at 17. But Green's race still undermines Battle's claim that racial bias tainted the interview stage. *Accord Walker v. Dalton*, 94 F. Supp. 2d 8, 12, 16 (D.D.C. 2000) (finding that the presence of a same-race interview panelist cut against an inference of pretext, even though a different official made the final selection). This is just one of many factors that negate an inference of discrimination here.

**2.**

Battle next contends that racial bias influenced Hatch's ultimate decision to hire Tabor. Pl.'s Opp'n at 18–28. But he once again produces no evidence of discrimination.

Recall that Hatch sought to go beyond the interview scores—which would have doomed Battle's candidacy—by asking Dethloff, a subject matter expert, for his recommendation. DSMF ¶ 15. Dethloff in turn solicited the views of R. Bernhard, a Division Manager at the Bureau. Hatch Decl. ¶ 9. According to Dethloff and Hatch, R. Bernhard was familiar with the work of both Battle and Tabor. *See id.* ¶¶ 9, 14; Hatch Decl. Ex. 2. Hatch also personally spoke with R. Bernhard. Hatch Decl. ¶ 14. R. Bernhard recommended Tabor over Battle "hands

down" and "[w]ithout hesitation." Hatch Decl. Ex. 2. He also relayed information damaging to Battle's candidacy—for example, that Battle "had difficulty accepting responsibility for his mistakes." Hatch Decl. ¶ 14.

Battle faults Hatch and Dethloff for consulting R. Bernhard. He claims that R. Bernhard was a "third-level supervisor" and so "could not provide an accurate opinion of his work performance." Pl.'s Claim of Disputed Material Facts ("PCDMF") ¶ 1, ECF No. 19; *see* Pl.'s Opp'n at 18–19, 27. In his view, they should have talked to his first- and second-level supervisors, who would have given a better assessment. *See* PCDMF ¶ 1; Pl.'s Opp'n at 18.

Perhaps. But the decision to consult only R. Bernhard is not evidence of willful blindness or bad faith. Battle nowhere disputes that R. Bernhard was a manager common to *both* him and Tabor or that R. Bernhard was familiar with the work of *both*. DSMF ¶ 16; PCDMF ¶ 1. Even accepting Battle's argument that a first-line supervisor would have known him better, it was reasonable for the decisionmakers to consult someone familiar with both candidates, rather than just one of them.[8]

---

[8] In reply, the Secretary appends declarations that clarified this issue. Hatch explains that because R. Bernhard "had knowledge about the performance of both [Tabor] and [Battle]," he "did not think it necessary to also reach out to . . . their immediate supervisors." Suppl. Hatch Decl. ¶ 3, ECF No. 20-4. And R. Bernhard himself weighs in, giving some insight into his negative assessment of Battle. R. Bernhard Decl. ¶¶ 2–3, ECF No. 20-5. In response, Battle moves for leave to file a sur-reply, or in the alternative, to strike the new declarations. Pl.'s Mot. at 1–2, ECF No. 21. The Court, in its discretion, will grant leave for the sur-reply. *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003). But having considered the arguments in the sur-reply, *see* Pl.'s Mot. at 4–8, the Court finds nothing improper about the new declarations, so it will deny Battle's motion to strike.

The supplemental Hatch declaration and the R. Bernhard declaration are designed to rebut Battle's claim—made in his opposition brief—that Hatch could not have reasonably relied on R. Bernhard's assessment, so the Secretary properly submitted them in reply. *See Smith v. Burns Clinic Med. Ctr., P.C.*, 779 F.3d 1173, 1175 n.6 (6th Cir. 1985). The Secretary did not identify R. Bernhard as a potential witness in his initial disclosures, but he had no obligation to supplement his disclosures because R. Bernhard's identity "became known to [Battle] during discovery." *Kapache v. Holder*, 677 F.3d 454, 468 (D.C. Cir. 2012); *see* Def.'s Opp'n to Pl.'s

Battle relatedly argues that R. Bernhard's negative assessment was unfounded. *See* Pl.'s Opp'n at 27–28. But he presents no evidence suggesting that Hatch or Dethloff did not honestly and reasonably believe the information R. Bernhard gave them. All available evidence instead shows that Hatch and Dethloff relied on R. Bernhard's assessment in good faith. *See* Hatch Decl. ¶¶ 9, 13–14; Hatch Decl. Ex. 2.

Next, Battle maintains that his nonselection reflects a larger pattern of the Bureau (and Hatch) passing over minority candidates. Pl.'s Opp'n at 26. Comparative and statistical evidence can be evidence of pretext in some cases. *See McDonnell Douglas Corp.*, 411 U.S. at 804–05. But here, that sort of evidence is weak to nonexistent.

Battle first claims that Hatch promoted twelve white employees to supervisory positions between 2016 and 2018 but only four nonwhite employees in that period. Pl.'s Opp'n at 26. This claim suffers from several problems. For one, Battle provides contradictory statistics. He elsewhere asserts that Hatch hired eight (not twelve) white employees and three (not four) nonwhite employees between 2016 and 2018. PSAMF ¶¶ 14–15. And the Court has no way to verify which set of numbers is accurate, because for both, Battle cites to materials not in the record. *See* Pl.'s Opp'n at 26; PSAMF ¶¶ 14–15. In fact, the only statistical evidence in the record comes from the Secretary, and according to this evidence, Hatch hired forty-two individuals between August 2015 and March 2018, twelve of whom were African American, three of whom were Hispanic, and one of whom was Asian. Hatch Decl. ¶ 18.

---

Mot. at 5, ECF No. 22. And contrary to Battle's suggestion, R. Bernhard's statements in his declaration are not hearsay because the Secretary offers them not for their truth but for the effect they had on Hatch, the decisionmaker. *See, e.g.*, *Toomer v. Mattis*, 266 F. Supp. 3d 184, 201 (D.D.C. 2017). Though the Court need not rely on these new declarations in entering judgment for the Secretary, they bolster his argument that Hatch and Dethloff reasonably relied on R. Bernhard's views.

But even if the worst version of Battle's numbers is accurate (four out of sixteen employees that Hatch promoted were nonwhite), it proves little.  Without statistics on how many nonwhite applicants were considered for the other positions, it is impossible to say whether a 25% minority hire rate is conspicuously low.  Nationally, African Americans make up about 13% of the population,[9] which suggests they may actually be overrepresented in Hatch's promotion selections.  Of course, the Bureau's workforce may have a higher percentage of African Americans than the national average, but again, Battle does not provide this information.  Indeed, "[s]tatistical calculations performed . . . in discrimination cases are not probative of anything without support from an underlying statistical theory," and "disparities may be explainable by other factors, such as . . . varying levels of qualifications among applicants." *Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1452 (D.C. Cir. 1988).

If anything, Battle's proffered comparator evidence is even less compelling.  He claims to have been passed over for promotion on three or four prior occasions.  *See* Pl.'s Opp'n at 26; Pl.'s Dep. at 2, ECF No. 18-4.  Though he claims these nonselections were also due to racial discrimination, he does not recall who was hired instead, so it is impossible to know if the selectees were even of a "different race." *Brady*, 520 F.3d at 495; *see* Pl.'s Dep. at 2–4.  He likewise offers no information about the qualifications of the selectees; indeed, he does not contend they were less qualified.  *See* Pl.'s Dep. at 2–3.  And he cannot recall who the selecting officials were.  *Id.*  Given all these missing pieces, Battle's previous lack of success is not evidence of pretext.  *See Waterhouse*, 298 F.3d at 995–96 (holding that a plaintiff's proposed

---

[9] *See* U.S. Census Bureau, *Quick Facts, United States*, https://www.census.gov/quickfacts/fact/table/US/PST045219 (last visited Aug. 12, 2020).

comparisons "added nothing" to her claim of pretext given "the absence of evidence that the comparators were actually similarly situated to her").

Finally, Battle urges that he was more qualified than Tabor and that Dethloff and Hatch either misrepresented or overlooked his superior credentials. *See* Pl.'s Opp'n at 19–24, 27. This can be a viable approach to showing pretext, since a "factfinder can legitimately infer that . . . employers do not usually [select a less-qualified candidate] unless some other strong consideration, such as discrimination, enters into the picture." *Aka*, 156 F.3d at 1294. A plaintiff can try to show that the employer's explanation for not hiring him "misstates [his] qualifications" or that the selectee was so much less qualified that an inference of racial bias is inescapable. *Id.* at 1294–95. Battle tries both, but his arguments are unpersuasive.

As Battle sees it, if we take the Secretary at his word, he "lacked the supervisory experience and leadership skills required for the position." Pl.'s Opp'n at 23. He protests that his resume amply demonstrated these qualities, and that Dethloff, who reviewed his resume (and Tabor's resume), simply ignored them. *Id.* at 19–24. But the Secretary does not claim that Battle lacks these qualities *entirely*, just that Tabor exhibited them to a greater degree. *See* Def.'s Mot. at 10, 17; Def.'s Reply at 6. In recommending Tabor, Dethloff noted only that Battle's resume did not provide enough details about his experience and leadership. *See* Hatch Decl. Ex. 2. And Hatch, in turn, relied on Dethloff's assessment, finding it consistent with the interview scores and R. Bernhard's feedback. Hatch Decl. ¶ 16. All available evidence suggests that Dethloff and Hatch genuinely believed that Tabor was better qualified, and Battle proffers no evidence calling this into question. *See Hairston*, 773 F.3d at 273.

Battle insists that he was, in fact, more qualified. *See* Pl.'s Opp'n at 23–24, 27; Compl. ¶ 31. But to defeat summary judgment with this argument, Battle must show that he was

16

"significantly" or "markedly" better qualified. *Aka*, 156 F.3d at 1294, 1299. This is a high bar—the qualifications gap must be essentially self-evident. As the D.C. Circuit has consistently held, "a disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is great enough to be *inherently* indicative of discrimination." *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) (emphasis added and cleaned up). Courts "will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates." *Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C. Cir. 2003).

But the gap between Tabor and Battle is anything but self-evident. This was, at most, a photo finish, not a lopsided contest that came out the wrong way. Battle had supervisory experience, private-sector printing experience, and troubleshooting experience. Pl.'s Opp'n at 20–21. But so did Tabor. Hatch Decl. Ex. 3 (Tabor Resume) at 17–18, 22, 36–39, ECF No. 18-3. Management selected Battle to represent his division and he had positive performance reviews. Pl.'s Opp'n at 22. Ditto, Tabor. Hatch Decl. Ex. 2; *id.* Ex. 3 at 18–19, 22.[10] The only distinctive experiences Battle identifies to show his superiority are (1) that he had served as an "acting" assistant supervisor while Tabor had not; (2) that he had worked in the Bureau for three more years than Tabor; and (3) that he was on time to his interview while Tabor was ten minutes late. Pl.'s Opp'n at 24, 27. But even setting aside the evidence of Tabor's distinctive qualities,

---

[10] The Secretary appends a new declaration to his reply brief noting that Battle and Tabor both received an "Exceeds" rating in their performance reviews for the 2016-2017 period. Bognar Decl. ¶ 2, ECF No. 20-3. The Court will deny Battle's motion to strike this declaration. It is designed to rebut Battle's claim that he was more qualified than Tabor, and although the Secretary did not identify Bognar as a potential witness in his initial disclosures, her identity became known to Battle during discovery. *See supra* note 8; Def.'s Opp'n to Pl.'s Mot. at 6 n.6. The Court need not rely on this declaration in entering judgment for the Secretary, but it bolsters his argument that Battle and Tabor were similarly qualified.

*see* Hatch Decl. Exs. 2, 3, these small differences do not amount to a gap "inherently" indicative of discrimination.

In cases in which the differences were enough to suggest discrimination, the disparity was chasmic. For example, in *Aka*, the employer passed over an applicant with a master's degree and nineteen years' experience in the hiring pharmacy for someone with no college degree and two months' experience in a different pharmacy. 156 F.3d at 1296–97. In *Stoe*, the employer ignored a woman for a man with no equivalent work experience, and the employer had glaringly failed to acknowledge the woman's "revolutionary" work in her department. 960 F.3d at 640–41.

This case is more like *Barnette*, in which the plaintiff, like Battle, had served in an "acting" role for the position and believed she was better qualified. 453 F.3d at 516–17. The court declined to infer pretext even though "the plaintiff had previously served in the position [she] sought in an acting capacity and the selectee had not." *Id.* at 518. The "small differences in substantive experience . . . [and] length of service" were "insufficient to show pretext." *Id.* at 517 (cleaned up). So too here.

Indeed, far from showing that his and Tabor's qualifications were substantially different, Battle asserts more than once that they were essentially the *same*. Pl's Opp'n at 3 ("Mr. Battle's resume reflected the *same* qualities as Mr. Tabor's resume."), 20 ("Mr. Battle's resume reflected the *exact same experience* and listed the *exact same qualities* as Mr. Tabor's resume.") (emphases added). This at most reveals a "close call," but that is not enough to send his case to a jury. *Barnette*, 453 F.3d at 518.

## IV.

In the end, after two levels of review, favorable treatment along the way, and consideration by six officials, not one concluded that Battle was more qualified than Tabor, and only one viewed them as equally qualified. All the available evidence shows that Hatch, the selecting official, honestly and reasonably believed that Tabor was more qualified. Battle's arguments to the contrary are unavailing, and he fails to show pretext.

For these reasons, the Court will grant the Secretary's motion for summary judgment. A separate Order will issue.

Dated: August 14, 2020                                          TREVOR N. McFADDEN, U.S.D.J.